UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| COOPER MOORE and ANDREW GILLETTE, on their own behalf and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBINHOOD FINANCIAL LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.: 2:21-cv-01571-BJR<br><br>**FIRST AMENDED COMPLAINT**<br><br><u>**CLASS ACTION**</u><br><br>**DEMAND FOR TRIAL BY JURY** |

## I.  NATURE OF THE ACTION

1. Robinhood Financial LLC is an online investments brokerage service firm headquartered in Menlo Park, California. Robinhood sells products and services that enable users to invest in stocks, exchange-traded funds, cryptocurrency, and options. Robinhood's for-profit products and services can be accessed through its free mobile application (the "Robinhood App") or on its website. While Robinhood does not charge a commission on trades, it generates revenues in other ways, including the direct sale of products and services to its users through the Robinhood App. Robinhood reported more than $958 million in total net revenues in 2020.[1]

2. To market its products and services, Robinhood created a referral program called "Refer a Friend." Robinhood encourages users to refer their contacts to the service by

---

[1] Robinhood Form S-1 at 23 (July 1, 2021) ("S-1"), *available at* https://www.sec.gov/Archives/edgar/data/1783879/000162828021013318/robinhoods-1.htm.

FIRST AMENDED COMPLAINT        1
(2:21-cv-01571-BJR)

remunerating users for each successful referral. Under the current incentives offered by the program, as soon the referred individual signs up for Robinhood and links his or her bank account, Robinhood credits both the referring user and the referred contact with reward stock. The payment offered by Robinhood to users varies, sometimes Robinhood pays users $5 or offers one or more shares of stock for each successful referral. The stock provided to users is randomly selected by Robinhood from its inventory of settled shares and can be worth anywhere between $2.50 and $225.  Users can earn up to $500 in shares each calendar year through the referral program.

3. The Robinhood App assists users in referring contacts. All the user has to do is tap "Rewards" or "Earn Rewards" in the top right corner of the home page of the Robinhood App, tap "Invite Contacts", and tap "Invite" next to the contacts the user wants to refer. The Robinhood App also displays alerts to users within the application reminding them to "Invite Friends" to earn free stock. The refer-a-friend model is a powerful method of mass marketing. At very minimal cost, Robinhood achieves targeted, immediate, and extensive promotion of its brand.

4. Robinhood assisted in sending to Plaintiffs refer-a-friend text messages while Plaintiffs were Washington residents.

5. Robinhood's conduct violated the Washington Consumer Electronic Mail Act ("CEMA"), RCW 19.190.010 *et seq.*, which makes it illegal for a person to "initiate or assist in the transmission of an electronic commercial text message to a telephone number assigned to a Washington resident for cellular telephone or pager service..." RCW 19.190.060.

6. "Assist the transmission" means "actions taken by a person to provide substantial assistance or support which enables any person to formulate, compose, send, originate, initiate, or transmit a commercial electronic mail message or a commercial electronic text message when the person providing the assistance knows or consciously avoids knowing that the initiator of the commercial electronic mail message or the commercial electronic text message is engaged, or intends to engage, in any practice that violates the consumer protection act." RCW 19.190.010.

FIRST AMENDED COMPLAINT       2
(2:21-cv-01571-BJR)

7. A violation of CEMA is a "per se" violation of the Washington Consumer Protection Act ("CPA"), RCW 19.86.010, *et seq*. RCW 19.190.100; *Wright v. Lyft, Inc.*, 406 P.3d 1149, 1154-55 (Wash. 2017).

8. Plaintiffs bring this action as a class action on behalf of persons who also received Robinhood's illegal spam texts. Plaintiffs' requested relief includes an injunction to end these practices, an award to Plaintiffs and class members of statutory and exemplary damages for each illegal text, and an award of attorneys' fees and costs.

## II.   PARTIES

9. Plaintiff Cooper Moore is a citizen of Washington State, residing in King County, Washington.

10. Plaintiff Andrew Gillette is a citizen of Washington State, residing in Skagit County, Washington.

11. Defendant Robinhood Financial LLC (Robinhood) is a Delaware Corporation with its principal place of business in Menlo Park, California. Robinhood is engaged in substantial business activities in the State of Washington and the United States, including, but not limited to assisting the transmission of the texts at issue in this case.

## III.   JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because (a) this is a proposed class action; (b) at least one member of the proposed class is a citizen of a state different than Defendant; (c) the number of members of the proposed class is not less than 100; and (d) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant is headquartered and transacts business in this District and some or all of the unlawful acts giving rise to this Complaint occurred in this District.

## IV.   FACTUAL ALLEGATIONS

**A.    The CEMA prohibits initiating or facilitating commercial text messages.**

14. The CEMA originally precluded unwanted emails that contain false or misleading

FIRST AMENDED COMPLAINT     3
(2:21-cv-01571-BJR)

information.

15. The Washington legislature amended the CEMA to "limit the practice" of sending commercial text messages to cell phones. *Lyft*, 406 P.3d at 1152 (quoting WASH. LAWS OF 2003, CH. 137, § 1).

16. The CEMA prohibits persons conducting business in the state of Washington to "initiate or assist in the transmission of an electronic commercial text message to a telephone number assigned to a Washington resident for cellular telephone or pager service that is equipped with short message capability or any similar capability allowing the transmission of text messages." RCW 19.190.060(1).

17. The statute provides a private cause of action to persons who received texts in violation of CEMA to enjoin further violations. RCW 19.190.090.

18. A person who receives a text message in violation of the CEMA may bring a claim for damages under Washington's Consumer Protection Act (CPA), RCW 19.86 *et seq.*

19. To establish a violation of Washington's CPA, a claimant must establish five elements: (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that affects the public interest, (4) injury to plaintiff's business or property, and (5) causation. *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986).

20. A violation of RCW 19.190.060 establishes all five elements of the CPA vis a vis RCW 19.190.060(2) (providing the practices prohibited under the statute "are matters vitally affecting the public interest" and "are not reasonable in relation to the development and preservation of business" and constitute "an unfair or deceptive act in trade or commerce and an unfair method of competition" for the purpose of applying the CPA). *See also Lyft*, 406 P.3d at 1155 (holding a violation of RCW 19.190.060 establishes the injury and causation elements of a CPA claim as a matter of law).

**B.    Defendant assists the transmission of commercial marketing texts.**

21. Defendant promotes the sale its products and services through its "refer-a-friend" marketing program.

FIRST AMENDED COMPLAINT                   4
(2:21-cv-01571-BJR)

22. Without an influx of new users generated through its referral program, Robinhood's revenue would be adversely impacted. As stated by Robinhood in its filings with the Securities and Exchange Commission, its revenue growth "is dependent on [its] ability to attract new customers, retain existing customers, increase the amount that [its] customers use [its] products and services and sell [its] premium services, such as Robinhood Gold."[2] Over 80% of users that join the platform join through the refer-a-friend program.[3]

23. While referred individuals can download the Robinhood App for free, they must link their bank account to their new Robinhood account in order to get the free share of stock offered through the refer-a-friend program. Robinhood used to award shares when it approved the referred individual's new account. However, in 2020, Robinhood changed its policy to award shares when referred individuals link a bank account to their new Robinhood account.[4] Robinhood stated that this change "allowed [it] to award shares only to customers with higher intent to use the platform," i.e., to spend money on Robinhood's for-profit products and services. Robinhood's policies make clear that the purpose of the refer-a-friend program, and the text messages sent through the program, is to promote or encourage the purchase of Robinhood's products and services.

24. One of the products Robinhood sells directly to users is "Robinhood Gold," a suite of tools, data, and features offered as a $5 per month subscription. Robinhood Gold users have access to features such as professional market research from Morningstar, Inc. and Level II market data from Nasdaq. Robinhood Gold users can also borrow money from Robinhood to purchase securities. Users pay interest on money borrowed from Robinhood over $1,000. In the first nine months of 2021, Robinhood's net interest revenue on borrowing from Robinhood Gold

---

[2] S-1 at 54.
[3] S-1 at 55.
[4] S-1 at 124.

FIRST AMENDED COMPLAINT  5
(2:21-cv-01571-BJR)

subscribers was over $93 million.[5] There are 1.4 million Robinhood Gold subscribers[6]--meaning Robinhood's annual revenues from subscription fees alone is likely to be near $80 million for 2021.

25. The bulk of Robinhood's revenue is generated when Robinhood users place orders for securities using the Robinhood app.[7] Robinhood routes users' securities orders to principal trading firms. The principal trading firms pay Robinhood to send them order flow, including a "Payment for Order Flow" ("PFOF") incentive fee. While Robinhood offers users trades without stated commissions, in 2020 the SEC found that Robinhood's PFOF practices resulted in worse execution prices for Robinhood users—and for large trades the higher prices were higher than the commissions users would pay elsewhere.[8] Thus Robinhood users pay for Robinhood's "commission-free" services by trading at inflated execution prices charged by the principal trading firms who then pass back money to Robinhood as PFOF.

26. Robinhood also charges miscellaneous fees to users who use its trading services, such as a $75 fee for transferring users' accounts to another broker-dealer, $20 for delivering a check to users, $5 for paper statements, etc. Robinhood generates millions in revenue from these fees charged to users. For example, revenues from transfer fees were up by $22.1 million for the nine months ended September 30, 2021, compared to the same period in 2020.[9]

27. Defendant pays its users to recruit additional Robinhood users in order to drive revenues. The exact form of payment offered to Robinhood users for successful referrals has varied since the start of the program. For example, Robinhood has remunerated users with $5,

---

[5] Robinhood Markets, Inc. Form 10-Q for the quarterly period ended September 30, 2021 ("Q3 2021 Form 10-Q") at 53, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001783879/9de6787d-7968-4bed-bc74-537fc285481f.pdf.
[6] *Id.* at 54.
[7] S-1 at 34.
[8] SEC Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order ¶ 2, Admin. Proceeding File No. 3-20171 (Dec. 17, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10906.pdf.
[9] Q3 2021 Form 10-Q at 54.

FIRST AMENDED COMPLAINT                6
(2:21-cv-01571-BJR)

one share of stock, three shares of stock, or even five shares of stock for each successful referral. Users are encouraged to send referrals to as many people as possible in order to improve the odds that someone they refer actually signs up, resulting in payment for the referrer, and can earn up to $500 worth of stock in one year.

28. Robinhood users who send Robinhood refer-a-friend text messages to Washington residents in order to earn payments for themselves and the Washington-resident-recipients of those messages are conducting business in Washington.

29. Further, many of the Robinhood users who send refer-a-friend text messages to Washington residents themselves live and are employed in Washington. These senders conduct business in Washington by virtue of, *inter alia* 1) their own contractual relationship with Robinhood as Washington-resident Robinhood users 2) their use of the Robinhood app to transact business with Robinhood as Washington-resident Robinhood users; 3) their engagement in other business relationships while residing in Washington, including, for example, their own subscriptions to cellular telephone service, and 4) their own employment in the state of Washington.

30. The Robinhood App, which is designed and maintained from Defendant's headquarters in Menlo Park, assists in the transmission of illegal text messages using two primary methods.

31. Specifically, when a Robinhood user clicks on either "Rewards" or "Earn Rewards" in the Robinhood App, the user is then prompted to either "Invite Contacts" or "Share Link."

32. Clicking on either option[10] prompts the user to select individuals from the contacts stored on the user's phone to whom to send Robinhood commercial marketing text

---

[10] If a Robinhood user selects "Invite Contacts," then the Robinhood App accesses the user's address book, displays the user's contacts in the Robinhood App, and sometimes recommends particular recipients. Using the "Share Link" method skips the step of the Robinhood App displaying these recommendations and instead directs the user to the native address book on the user's phone.

FIRST AMENDED COMPLAINT  7
(2:21-cv-01571-BJR)

messages.

33. Once the contacts to whom the message will be sent are selected, the user's native text messaging application opens with a pre-composed text message directed to the selected recipient(s) containing Robinhood marketing content.

34. The pre-addressed text message includes an invitation to join Robinhood, a promise of free stock, and a unique referral link that allows Robinhood to identify the sender of the message.

35. All the user has to do is hit send and the message that Defendant composed is sent to the selected contacts.

36. Defendant substantially assists and supports its users in sending illegal text messages by, *inter alia*: a) encouraging and incentivizing its users to send referral messages by compensating them with free stock; b) technologically enabling its users to initiate referral text messages through the Robinhood App; c) suggesting which contacts should receive referral text messages when the user uses the "Share Contacts" method; d) composing the text messages; e) composing and providing unique user-specific referral links that a text recipient can use to sign up for Defendant's services; and f) formulating text and images to be sent as part of the refer-a-friend text messages.

37. Defendant does not obtain recipients' clear and affirmative consent in advance to receive the referral text messages and consciously avoids knowing whether its users send the commercial marketing text messages without obtaining recipients' clear and affirmative consent in advance to receive the referral text messages.

38. Defendant knows that its users are seeking payment through the referral program for referring Washington residents to Robinhood, often by text message. Defendant also knows which of its users conduct business in Washington by virtue of residing in Washington because users must provide an address to Robinhood when they sign up for an account.

39. But Defendant knows or consciously avoids knowing whether its users send the commercial marketing text messages without obtaining recipients' clear and affirmative consent

FIRST AMENDED COMPLAINT         8
(2:21-cv-01571-BJR)

in advance to receive the referral text messages.

40. Defendant does not inform its users that they should obtain those recipient's clear and affirmative consent in advance to receive the referral text messages. Nor does Defendant employ any controls from within the app to ensure that its users obtain recipient's clear and affirmative consent in advance to receive the referral text messages before enabling them to send the commercial marketing text messages.

C. **Defendant assisted in the transmission of illegal text messages to Plaintiffs.**

41. At all times relevant to this Complaint, Plaintiff Moore has resided in Washington State.

42. At all times relevant to this Complaint, Plaintiff Moore has subscribed to a cellular telephone number.

43. Plaintiff Moore's cellular telephone has the capacity to send and receive transmissions of electronic text messages.

44. On March 14, 2018, Plaintiff Moore received an unsolicited commercial electronic text message inviting him to sign up for Defendant's online brokerage services. The text, which included formulaic language and stock images, stated: "Join Robinhood and we'll both get a stock like Apple, Ford, or Sprint for free. Make sure you use my link."

FIRST AMENDED COMPLAINT         9
(2:21-cv-01571-BJR)

45. Below is a screenshot of the text Plaintiff Moore received:



46. Plaintiff Moore did not provide clear and affirmative consent in advance to receive the text message.

47. Plaintiff Moore's privacy was invaded by the text messages he received promoting Defendant's products and services. Plaintiff Moore did not understand why he was receiving annoying and harassing spam texts, which are a nuisance. Plaintiff Moore responded to the text by saying, "Please stop sending me ads."

48. The Robinhood user who sent Plaintiff Moore the unsolicited commercial electronic text message resided in Elma, Washington and was self-employed in Washington at the time she sent the text message. The Robinhood user also conducted a contractual business relationship with Robinhood in Washington by virtue of being a Robinhood user and using the app. She also conducted other business relationships in Washington at the time of the text message, including, for example, subscribing to a cellular telephone service.

49. Robinhood knew the Robinhood user who sent Plaintiff Moore a refer-a-friend text message was a Washington resident because Robinhood users are required to provide their address to Robinhood. Robinhood also knew that the user conducted business in Washington by

FIRST AMENDED COMPLAINT         10
(2:21-cv-01571-BJR)

1  virtue of being a Robinhood user, using the app, and maintaining a phone number in the state.

2      50.    At all times relevant to this Complaint, Plaintiff Gillette has resided in
3  Washington State.

4      51.    At all times relevant to this Complaint, Plaintiff Gillette has subscribed to a
5  cellular telephone number.

6      52.    Plaintiff Gillette's cellular telephone has the capacity to send and receive
7  transmissions of electronic text messages.

8      53.    On March 4, 2020, Plaintiff Gillette received an unsolicited commercial electronic
9  text message inviting him to sign up for Defendant's online brokerage services. The text stated:
10 "You now have a claim to a stock like Apple, Ford, or Facebook. In order to keep this claim to
11 your stock, sign up and join Robinhood using my link."

12     54.    Below is a screenshot of the text Plaintiff Gillette received:



FIRST AMENDED COMPLAINT  11
(2:21-cv-01571-BJR)

55. Plaintiff Gillette did not provide clear and affirmative consent to receive the text message.

56. Plaintiff Gillette's privacy was invaded by the text message he received promoting Defendant. Plaintiff Moore did not understand why he was receiving annoying and harassing spam texts, which are a nuisance. Plaintiff was confused about why he received the text and responded, "Robinhood? Is it spam?"

57. The Robinhood user who sent Plaintiff Gillette the unsolicited commercial electronic text message resided in Lakewood, Washington and was employed in Washington at the time he sent the text message. The Robinhood user also conducted a contractual business relationship with Robinhood by virtue of being a Robinhood user and using the app. He also engaged in other business relationships in Washington at the time of the text message, including, for example, subscribing to a cellular telephone service.

58. Robinhood knew the Robinhood user who sent Plaintiff Gillette a refer-a-friend text message was a Washington resident because Robinhood users are required to provide their address to Robinhood. Robinhood also knew that the user conducted business in Washington by virtue of being a Robinhood user, using the app, and maintaining a phone number in the state.

## V. CLASS ACTION ALLEGATIONS

59. <u>Class Definition</u>. Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs bring this case as a class action on behalf of a Class defined as:

> All persons[11]:
>
> 1) to whose telephone number Defendant assisted in the transmission of one or more commercial electronic text messages as part of its referral program from August 9, 2017 through the date the Court certifies the Class;
>
> 2) where such message was sent while such person was a Washington resident; and
>
> 3) while the number to which the message was sent was assigned for cellular phone or pager service that is equipped with short

---

[11] As that term is defined in RCW 19.190.010(11) and RCW 19.86.010(a).

FIRST AMENDED COMPLAINT   12
(2:21-cv-01571-BJR)

message capability or any similar capability allowing the transmission of text messages.

Excluded from the Class are any persons who initiated a commercial electronic text message as part of Defendant's referral program, Defendant, any entity in which Defendant has a controlling interest or that has a controlling interest in Defendant, and Defendant's legal representatives, assignees, and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

60.  <u>Numerosity</u>. The Class is so numerous that joinder of all members is impracticable. The Class has more than 1,000 members. Moreover, the disposition of the claims of the Class in a single action will provide substantial benefits to all parties and the Court.

61.  <u>Commonality</u>. There are numerous questions of law and fact common to Plaintiffs and members of the Class. The common questions of law and fact include, but are not limited to:

   a.  Whether Defendant assisted the transmission of commercial electronic text messages to recipients residing in Washington State in violation of RCW 19.190.060;

   b.  Whether a violation of RCW 19.190.060 establishes all the elements of a claim under Washington's Consumer Protection Act, RCW 19.86 *et seq.*;

   c.  Whether Plaintiffs and the proposed Class are entitled to an injunction enjoining Defendant from sending the unlawful texts in the future; and

   d.  The nature and extent of Class-wide injury and damages.

62.  <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs' claims, like the claims of the Class arise out of the same common course of conduct by Defendant and are based on the same legal and remedial theories.

63.  <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained competent and capable attorneys with significant experience in complex and class action litigation, including consumer class actions and class actions involving unlawful text messages under Washington law. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with those of the

FIRST AMENDED COMPLAINT         13
(2:21-cv-01571-BJR)

proposed Class.

64. <u>Predominance</u>. Defendant has a standard practice of assisting the transmission of commercial electronic text messages to subscribers of cellular telephone numbers residing in Washington State. The common issues arising from this conduct predominate over any individual issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

65. <u>Superiority</u>. Plaintiffs and members of the Class have been injured by Defendant's unlawful conduct. Absent a class action, however, most Class members likely would find the cost of litigating their claims prohibitive. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. The members of the Class are readily identifiable from Defendant's records and there will be no significant difficulty in the management of this case as a class action.

66. <u>Injunctive Relief</u>. Defendant's conduct is uniform as to all members of the Class. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole. Plaintiffs further allege, on information and belief, that the texts described in this Complaint are substantially likely to continue in the future if an injunction is not entered.

## VI.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(Violations of Washington's Commercial Electronic Mail Act, RCW 19.190 *et seq*.)**

67. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

68. Washington's CEMA prohibits any "person," as that term is defined in RCW 19.190.010(11), from initiating or assisting the transmission of an unsolicited commercial electronic text message to a Washington resident's cellular telephone or similar device.

FIRST AMENDED COMPLAINT   14
(2:21-cv-01571-BJR)

69. Defendant is a "person" within the meaning of the CEMA, RCW 19.190.010(11).

70. Defendant assisted the transmission of one or more commercial electronic text messages to Plaintiffs and proposed Class members.

71. Defendant's acts and omissions violated RCW 19.190.060(1).

72. Defendant's acts and omissions injured Plaintiffs and proposed Class members.

73. Plaintiffs and Class members are therefore entitled to injunctive relief in the form of an order enjoining further violations of RCW 19.190.060(1).

## SECOND CLAIM FOR RELIEF

**(*Per se* violation of Washington's Consumer Protection Act, RCW 19.86 *et seq*.)**

74. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

75. Plaintiffs and Class members are "persons" within the meaning of the CPA, RCW 19.86.010(1).

76. Defendant violated the CEMA by assisting in the transmission of an unsolicited commercial electronic text message to Plaintiffs and Class members' cellular telephone or similar devices.

77. A violation of the CEMA establishes all five elements of Washington's Consumer Protection Act as a matter of law. RCW 19.190.100 & *Lyft*, 406 P.3d at 1155.

78. Defendant's violations of the CEMA are unfair or deceptive acts or practices that occur in trade or commerce under the CPA. RCW 19.190.100.

79. Defendant's unfair or deceptive acts or practices vitally affect the public interest and thus impact the public interest for purposes of applying the CPA. RCW 19.190.100.

80. Pursuant to RCW 19.19.040(1), damages to each recipient of a commercial electronic text message sent in violation of the CEMA are the greater of $500 for each such message or actual damages, which establishes the injury and causation elements of a CPA claim as a matter of law. *Lyft*, 406 P.3d at 1155.

FIRST AMENDED COMPLAINT         15
(2:21-cv-01571-BJR)

81.     Defendant engaged in a pattern and practice of violating the CEMA. As a result of Defendant's acts and omissions, Plaintiffs and Class members have sustained damages, including $500 in statutory damages, for each and every text that violates the CEMA. The full amount of damages will be proven at trial. Plaintiffs and Class members are entitled to recover actual damages and treble damages, together with reasonable attorneys' fees and costs, pursuant to RCW 19.86.090.

82.     Under the CPA, Plaintiffs and members of the Class are also entitled to, and do seek, injunctive relief prohibiting Defendant from violating the CPA in the future.

## VII.     REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the members of the Class, request judgment against Defendant as follows:

A.     That the Court certify the proposed Class;

B.     That the Court appoint Plaintiffs as Class Representatives.

C.     That the Court appoint the undersigned counsel as counsel for the Class;

D.     That the Court should grant declaratory, equitable, and/or injunctive relief as permitted by law to ensure that Defendant will not continue to engage in the unlawful conduct described in this Complaint;

E.     That, should the Court permit Defendant to engage in or rely on spam texting, it enter a judgment requiring them to adopt measures to ensure CEMA compliance, and that the Court retain jurisdiction for a period of at least six months to ensure that Defendant complies with those measures;

F.     That the Court enter a judgment awarding any other injunctive relief necessary to ensure Defendant's compliance with the CEMA;

G.     That Defendant be immediately restrained from altering, deleting or destroying any documents or records that could be used to identify members of the Class;

FIRST AMENDED COMPLAINT                 16
(2:21-cv-01571-BJR)

H. That Plaintiffs and all Class members be awarded statutory damages in the amount of $500 for each violation of the CEMA pursuant to RCW 19.190.040(1) and treble damages pursuant to RCW 19.86.090;

I. That the Court enter an order awarding Plaintiffs reasonable attorneys' fees and costs; and

J. That Plaintiffs and all Class members be granted other relief as is just and equitable under the circumstances.

## VIII. TRIAL BY JURY

Plaintiffs demand a trial by jury for all issues so triable.

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Beth E. Terrell, WSBA #26759
Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com
Jennifer Rust Murray, WSBA #36983
Email: jmurray@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, Washington 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

E. Michelle Drake, Admitted *Pro Hac Vice*
Email: mdrake@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470

Sophia M. Rios, Admitted *Pro Hac Vice*
Email: srios@bm.net
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, California 92101
Telephone: (619) 489-0300
Facsimile: (215) 875-4604

*Attorneys for Plaintiffs*

FIRST AMENDED COMPLAINT                17
(2:21-cv-01571-BJR)