The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

COOPER MOORE and ANDREW GILLETTE, on their own behalf and on behalf of others similarly situated,

Plaintiffs,

v.

ROBINHOOD FINANCIAL LLC, a Delaware limited liability company,

Defendant.

Case No. 2:21-cv-01571-BJR

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

*Oral Argument Requested*

## I. INTRODUCTION

This case involves a scam Robinhood Financial LLC invented to pay and enable its users to spam their contacts with text message advertisements asking those contacts to "join Robinhood." Until recently, Robinhood's scheme of having its users do the work for it *may* have protected it under the *federal* Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227(a)(1). But, unfortunately for Robinhood, the Washington legislature anticipated scams like this and declared them to be illegal. Faced with its own failure to account for *state* law regulating its conduct, Robinhood instead asks the Court to adopt an interpretation of the Washington Consumer Electronic Mail Act ("CEMA"), Wash. Rev. Code § 19.190.010 et seq., that would render the legislature's efforts in vain. The Court should decline to do so.

Robinhood's motion to dismiss should be denied for three reasons. First, Robinhood violated Washington law by substantially assisting and supporting its users in sending text messages marketing Robinhood. CEMA defines "substantial assistance or support" to include that which enables any person to formulate, compose, send, originate, initiate, or transmit commercial text messages. Wash. Rev. Code § 19.190.010(1). Robinhood provides substantial assistance by (a) encouraging and incentivizing its users to send referral messages by compensating them with free stock; (b) technologically enabling its users to initiate referral messages through the Robinhood App; (c) suggesting which contacts should receive referral text messages when the user uses the "Share Contacts" method; (d) composing the text messages; (e) composing and providing unique user-specific referral links that the text recipient can use to sign up for Robinhood's services; and (f) formulating text and images to be sent as part of the Refer-a-Friend text messages. Dkt. No. 54 (FAC) ¶ 36. These allegations more than suffice to state a claim under the CEMA.

Second, the text initiators are not required to themselves violate the statute or to "conduct business" in Washington in order for Robinhood to be liable. All that is required is that *Robinhood* conduct business in Washington, substantially assist in the transmission of the texts, and "know or consciously avoid knowing" that the initiators are sending such texts without

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 1
Case No. 2:21-cv-01571-BJR

obtaining recipients' clear and affirmative consent in advance. Wash. Rev. Code § 19.190.010(1). Moreover, even if the CEMA requires initiators to conduct business in Washington, the First Amended Complaint sufficiently alleges that they were. "Conduct business" means what it says. Robinhood users, who earn payments for themselves by sending texts to Washington residents, "conduct business" in Washington when they send the texts. Robinhood users who live and work in Washington also "conduct business" in Washington by virtue of their own contractual relationship with Robinhood, their use of Robinhood to transact business, their engagement in other business relationships while residing in Washington, and their own employment in Washington. Robinhood's twisted interpretation of the statute as requiring the initiator to "conduct business" in Washington combined with Robinhood's burdensome interpretation of what it means to "conduct business" would, if adopted, impose a Herculean standard for liablity that would render it nearly impossible to hold individuals liable. That outcome is contrary to the plain language of the statute, which specifically includes "individuals" as some of the "persons" who are subject to liability. *See* RCW 19.190.11. Robinhood's interpretation also undermines the remedial purpose of the CEMA and Consumer Protection Act ("CPA"), which is to protect consumers from scams like the one here.

Third, the texts are commercial in nature because they promote Robinhood's for-profit products and services. Courts have concluded that a message can be "commercial" under CEMA without explicitly mentioning the defendant's products or services. The statute also does not require that the message promote a transaction that results in a direct exchange of cash between the defendant and the recipient of the message. Robinhood generates revenue by soliciting consumers to "join Robinhood" and download Robinhood's mobile application ("Robinhood App"). Once a consumer "joins Robinhood," Robinhood sells those users a variety of products and services and earns money on the trades they make. This is no different than Best Buy sending texts to customers urging them to renew their "Reward Zone" subscription or redeem their Reward Zone points. *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Consumers who "join Robinhood" enter the virtual Robinhood store and can purchase the

products and services that Robinhood peddles. Indeed, Robinhood does not even allow text recipients to redeem the free stock offers until they link a bank account to their Robinhood account. The texts are clearly commercial in nature. Robinhood's motion should be denied.

## II.   STATEMENT OF FACTS

**A.   Robinhood substantially assists the transmission of the commercial texts.**

Robinhood is an online investments brokerage service firm. FAC ¶ 1. Robinhood sells products and services that enable users to purchase stocks, exchange-traded funds, cryptocurrency, and options without paying a commission. *Id.* Users are able to purchase Robinhood's products and services on the Robinhood App or on Robinhood's website. *Id.*

To increase revenue, Robinhood created a marketing program called "Refer a Friend." FAC ¶ 2. Through the program Robinhood pays its users to recruit additional Robinhood users. *Id.* ¶ 27. For example, Robinhood has remunerated users with $5, one share of stock, three shares of stock, or even five shares of stock for each successful referral. *Id.* Users are encouraged to send referrals to as many people as possible in order to improve the odds that someone they refer actually signs up and can earn up to $500 worth of stock in one year. *Id.* Users and recipients are paid for the successful referral as soon as the user's contact signs up for Robinhood *and* links their bank account. *Id.* ¶ 23. Robinhood used to credit the stock upon approval of the new account, but, in or around 2020, Robinhood changed the program to award stock only after the referred contact links their bank account to Robinhood's platform. *Id.* This change "allowed [Robinhood] to award shares only to customers with higher intent to use the platform." *Id.*

Robinhood's Refer a Friend program relies on the transmittal of commercial text messages for its success. Robinhood assists its users in the transmission of commercial marketing texts using two primary methods. FAC ¶ 30. When a Robinhood user clicks on either "Rewards" or "Earn Rewards" in the Robinhood app, the user is then prompted to either "Invite Contacts" or "Share Link." *Id.* ¶ 31. Clicking on either option prompts the user to select individuals from the contacts stored on the user's phone to send Robinhood commercial marketing text messages. *Id.* ¶ 32. The app even recommends particular contacts to whom the

user should send referral messages. *Id*. n.10. Once the contacts to whom the message will be sent are selected, the user's native text messaging application opens with a pre-composed text message pre-addressed to the selected recipient(s) containing Robinhood marketing content. *Id*. ¶ 33. The pre-addressed text message includes an invitation to "join Robinhood," a promise of free stock, and a referral link that allows Robinhood to identify the user that initiated the message. *Id*. ¶ 34. The user hits send and the pre-composed message is sent to the selected contacts. *Id*. ¶ 35.

Robinhood does not obtain recipients' clear and affirmative consent in advance to receive the referral text messages and consciously avoids knowing whether the text message initiators send the commercial text messages without obtaining recipients' clear and affirmative consent in advance to receive the referral text messages. FAC ¶¶ 37, 39. Robinhood does not inform its users that they should obtain any recipient's clear and affirmative consent in advance to receive the referral text messages. *Id.* ¶ 40. Robinhood also does not employ any controls from within the application to ensure that initiators first obtain recipients' clear and affirmative consent to receive the referral text messages before enabling them to send the commercial text messages.

Plaintiffs, who are Washington residents, received commercial electronic text messages inviting them to create an online brokerage account with Robinhood. FAC ¶¶ 44, 53. Each text received by Plaintiffs, and reproduced in the FAC, contained formulaic language and stock images drafted by Robinhood. *Id.* ¶¶ 48, 53. Each text message asked Plaintiffs to "join Robinhood" in order to receive free stock. *Id.* ¶¶ 44-45, 53-54. Plaintiffs did not provide clear and affirmative consent in advance to receive the text messages. *Id.* ¶¶ 46, 55.

**B.    Robinhood users conduct business in Washington.**

Robinhood users who send Robinhood refer-a-friend text messages to Washington residents in order to earn payments conduct business in Washington by marketing Robinhood's services with Robinhood's assistance in exchange for payment. FAC ¶ 28. Further, many of the Robinhood users who send refer-a-friend text messages to Washington residents themselves live and are employed in Washington. These senders also conduct business in Washington by virtue of, among other things (1) their own contractual relationship with Robinhood as Washington-

resident Robinhood users; (2) their use of the Robinhood App to transact business with Robinhood as Washington-resident Robinhood users; (3) their engagement in other business relationships while residing in Washington, including, for example, their own subscriptions to cellular telephone service; and (4) their own employment in the state of Washington. *Id.* ¶ 29.

The Robinhood users who sent text messages to Plaintiffs resided and were employed in Washington at the time Robinhood assisted them in sending the texts. FAC ¶¶ 48, 57. Robinhood knows when the users it enlists to send text messages reside in Washington because Robinhood users are required to provide their addresses to Robinhood. *Id.* ¶¶ 49, 58.

**C.   Robinhood's refer-a-friend texts are commercial in nature.**

The text messages that Robinhood helped its users send urged the recipients, including Plaintiffs, to "join Robinhood." FAC ¶¶ 44-45, 53-54. Robinhood depends on consumers "joining Robinhood" in order to generate revenue. *See id.* ¶ 22 (Robinhood's revenue growth "is dependent on [its] ability to attract new customers, retain existing customers, increase the amount that [its] customers use [its] products and services and sell [its] premium services, such as Robinhood Gold."). Once a consumer "joins Robinhood," the user can purchase securities and goods and services directly from Robinhood. *Id.* ¶¶ 24-25.

One of the products Robinhood sells directly to users is "Robinhood Gold," a suite of tools, data, and features offered as a $5 per month subscription. *Id.* ¶ 24. Robinhood generates hundreds of millions of dollars with Robinhood Gold, including from subscription fees and charging interest to Robinhood Gold users who borrow money to make trades. *Id.* Robinhood also charges miscellaneous fees to users who use its trading services. *Id.* ¶ 26.

The bulk of Robinhood's revenue is generated when Robinhood users purchase securities using the Robinhood App. FAC ¶ 25. Robinhood routes users' securities orders to principal trading firms, who then pay Robinhood to send them order flow, including a "Payment for Order Flow" ("PFOF") incentive fee. In 2020 the SEC found that Robinhood's PFOF practices resulted in worse execution prices for Robinhood users. *Id.* Thus, Robinhood users who use Robinhood to

purchase securities do not pay a commission, but are likely paying a higher price for those securities than if they had purchased them elsewhere. *Id.*

Robinhood relies heavily on the Refer a Friend program to drive revenue—over 80% of users that join the platform join through the program. FAC ¶ 22. Without an influx of new users, Robinhood's revenue would be adversely impacted. *Id.*

### III.    LEGAL STANDARD

**A.    Standard on a motion to dismiss.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party." *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1042 (9th Cir. 2015).

**B.    Both the CEMA and the CPA must be liberally construed to protect consumers.**

The Washington legislature's goal in enacting the CEMA was to "limit the practice of sending unsolicited commercial text messages to cellular telephone or pager numbers in Washington." 2003 Wash. Legis. Serv. 137, Sec. 1. The legislature recognized "that the number of unsolicited commercial text messages sent to cellular telephones and pages is increasing" and that the practice was raising "serious concerns on the part of cellular telephone and pager subscribers." *Id.* The CEMA should be interpreted to further this purpose.

The Washington Supreme Court requires courts to "construe remedial statutes liberally in accordance with the legislative purpose behind them" and "in favor of the consumers they aim to protect." *Jametsky v. Olsen*, 317 P.3d 1003, 1006-07 (Wash. 2014); *Wright v. Lyft, Inc.*, 406 P.3d 1149, 1151 (Wash. 2017) ("*Wright II*"). The Washington CPA is a remedial statute designed to deter unfair or deceptive acts or practices in the conduct of any trade or commerce, protect the

public, and "foster fair and honest competition." Wash. Rev. Code § 19.86.920; *Panag v. Farmer's Ins. Co. of Wash.*, 204 P.3d 885, 889 (Wash. 2009). The CPA is to be "liberally construed that its beneficial purposes may be served." Wash. Rev. Code § 19.86.920.

## IV.     ARGUMENT AND AUTHORITY

**A.     Plaintiffs plausibly allege that Robinhood assisted the transmission of the unlawful commercial marketing texts.**

Under the CEMA, a person conducting business in the state of Washington may not "initiate or assist in the transmission of an electronic commercial text message to a telephone number assigned to a Washington resident for cellular telephone or pager service that is equipped with short message capability or any similar capability allowing the transmission of text messages." Wash. Rev. Code § 19.190.060(1). The definition of "assist the transmission" in the CEMA is broad. It means:

> *actions taken by a person to provide substantial assistance or support which enables any person to formulate, compose, send, originate, initiate, or transmit a commercial electronic mail message or commercial electronic text message when the person providing the assistance knows or consciously avoids knowing that the initiator of the commercial electronic mail message or the commercial electronic text message is engaged, or intends to engage, in any practice that violates the consumer protection act.*

Wash. Rev. Code § 19.190.010(1).

Robinhood asserts that Plaintiffs have failed to allege that Robinhood (1) provided "substantial assistance" to its users in sending the messages; or (2) knew or consciously avoided knowing that the initiator of text message was engaged, or intended to engage, in any practice that violates the consumer protection act. (Def's Memo at 5-10).

1.     <u>Plaintiffs plausibly allege Robinhood enabled users to formulate, compose, send, originate, initiate, or transmit the referral texts</u>.

Plaintiffs have alleged specific facts showing Robinhood "provided substantial assistance or support" that enabled users to "formulate, compose, send, originate, initiate, or transmit" the text messages at issue in this case. Specifically, Robinhood provided this assistance by (1) paying users to participate in its referral program (FAC ¶ 27), (2) designing and deploying a

mobile "app" that allowed users to easily send the messages using the app by either clicking "Invite Contacts" or "Share Link" (*id.* ¶¶ 30-35), (3) prompting users to select individuals to whom to send the texts from their contacts (*id.* ¶¶ 31-32), (4) composing text messages directed to the users' contacts containing Robinhood marketing content, links and images (*id.* ¶¶ 33-34), and (5) automatically opening the users' text messaging application containing the pre-composed and pre-addressed text message (*id.*). These facts "satisfactorily allege[] a CEMA violation" because Plaintiffs have "established a chain of events wherein Defendant 'assisted' with the transmission of an invitational text." *Wright v. Lyft, Inc.*, 2016 WL 7971290, at *4 (W.D. Wash. Apr. 15, 2016) ("*Wright I*") (declining to dismiss CEMA claim for similar "refer-a-friend" text sent with assistance of defendant's app); *Wright II*, 406 P.3d at 1150 (observing that Lyft's application "invites users to initiate text messages to a user's contacts" and describing the process as involving "a Lyft user opening the application, clicking on the 'Settings' menu, selecting 'Invite Friends,' then selecting one or multiple individuals from the user's contacts or 'Select All,' and, finally, agreeing to 'Send Invites'").

Robinhood contends that Plaintiffs' "assistance" allegations fall short because the text initiators had final control of the text messages but ignores that "assistance" does not require final editorial control. Plaintiffs' allegations outlining the manner in which Robinhood enabled its users to "formulate, compose, send, originate, initiate, or transmit" the illegal text messages are sufficient to satisfy the definition. With CEMA, "it makes no difference if some other party 'initiated' the text message to Plaintiff by going through the invitational process." *Wright I*, 2016 WL 7971290, at *4. Plaintiff's allegations also are far more robust and detailed than the allegations in *Frank v. Cannabis & Glass*, 2019 WL 4855378 (E.D. Wash. Oct. 1, 2019). In that case, the plaintiff brought CEMA and TCPA claims against both the retailers who sent the texts and a company called Springbig that provided the texting platform to the retailers. The plaintiff alleged only that Springbig provided a programmable platform to the retailers and included sample text messages on its website. *Frank*, 2019 WL 4855378, at *2-3. The plaintiff did not allege that the retailers used those samples or that Springbig knew or consciously avoided

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 8
Case No. 2:21-cv-01571-BJR

knowing that the retailer defendants were engaged in a practice that violated the CPA. *Id.* at *3. On those facts, the Court granted Springbig's motion to dismiss the plaintiff's CEMA and CPA claims, but notably also granted the plaintiff leave to amend. *See id.* at *3-4.

Robinhood's reliance on cases addressing TCPA "involvement" liability is also misplaced. The CEMA specifically provides that a person is liable for unlawful text messages if the person "assists" in formulating, composing, sending, originating, initiating, or transmitting the illegal text messages. The TCPA contains no parallel assistance language. And unlike the TCPA, Washington does not require that a person be "so involved in the placing of a specific telephone call as to be deemed to have initiated it." *Compare* Wash. Rev. Code 19.190.010(1) *with De la Cabada v. Ytel, Inc.*, 2020 WL 1156909, at *3 (N.D. Cal. Mar. 10, 2020), *and Adzhikosyan v. Callfire, Inc.*, 2019 WL 7856759, at *2 (C.D. Cal. Nov. 20, 2019). In addition, those cases involved allegations against third-party entities that provided software applications or platforms to solely facilitate calling. Robinhood, by contrast, developed a homegrown app where users can purchase securities and Robinhood's products and services, wrote the messages and the links they contained, enabled the App to pre-select contacts and recipients, and *paid* its users to send spam text messages so that it could acquire more users who would complete transactions on the App. The various factors that the Federal Communications Commission developed in its 2015 Ruling to determine whether entities that provide software or platforms to facilitate calling are subject to the TCPA simply do not apply here.

  2. <u>Robinhood "knew or consciously avoided knowing" its users were sending unsolicited commercial text messages.</u>

Plaintiffs plausibly allege that Robinhood assisted in the transmission of the texts because Robinhood "knew or consciously avoided knowing" that the text initiators were "engaged, or intend[ed] to engage, in any practice that violates the consumer protection act." *See* Wash. Rev. Code § 19.190.010(1) & (7). Plaintiffs allege that Robinhood encouraged and incentivized users to send commercial text messages to their contacts and knows or consciously avoids knowing whether initiators send the texts without obtaining clear and affirmative consent in advance. FAC

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 9
Case No. 2:21-cv-01571-BJR

¶ 37. Robinhood never informs its users that they should obtain any recipient's clear and affirmative consent to receive the texts, nor does it employ any controls from within the app to ensure its users obtain recipients' clear and affirmative consent before sending the messages. *Id.* ¶¶ 39-40. Robinhood's Motion ignores these facts, which taken as true show that Robinhood turns a blind eye to whether initiators obtain consent to send the texts before sending them.

Robinhood maintains that Plaintiffs cannot allege that Robinhood "knew or consciously avoided knowing" that text initiators were "engaged, or intend[ed] to engage, in any practice that violates the consumer protection act" without showing that initiators actually violated the CEMA, which would require that the initiators "conduct[] business in Washington." Wash. Rev. Code 19.190.060(1). Robinhood misconstrues the text of the statute to create a requirement that does not exist. Under CEMA, either the person initiating the text message *or* the person "assisting in the initiation" of the text message must be conducting business in Washington. RCW 19.190.060(1). Plaintiffs allege that Robinhood conducts business in the state, satisfying this requirement.

For an assistance claim, the CEMA further requires plaintiffs to allege that the initiators of the texts "engage[], or intend[] to engage, *in any practice* that violates the CPA." Wash. Rev. Code § 19.190.010(1) (emphasis added). To "engage in" means to "take part in something." Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/engage-in-sth. The statute does not require Plaintiffs to prove that the initiators *themselves* violated the CEMA or the CPA. It only requires Plaintiffs to prove that initiators "took part in" *Robinhood's* CEMA violations. Plaintiffs allege that the initiators "engaged in" a "practice" that violates the CPA, i.e., the sending of unsolicited commercial text messages to Washington residents. It would be counter to the intent of the CPA and CEMA if corporations conducting business in Washington, such as Robinhood, could violate the CEMA and CPA but escape liability simply by paying entities outside the state or individuals to send texts on their behalf. The entire purpose behind CEMA's "assistance" language is to prevent precisely this kind of outsourcing. Interpreting CEMA to allow a company doing business in Washington to recruit consumers to do

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 10
Case No. 2:21-cv-01571-BJR

its dirty work is also contrary to the remedial purpose the legislature intended and Robinhood's convoluted anti-consumer interpretation should be rejected. Plaintiffs have plausibly alleged a claim against *Robinhood* under the CEMA.

Moreover, even if Plaintiffs must allege that the initiators also violated the CEMA and were "conducting business" in Washington, Plaintiffs have done so. Plaintiffs allege that Robinhood pays text initiators for each successfully referred contact with stock and that Robinhood users can earn stock worth up to $500 in one year. FAC ¶¶ 2, 27, 28. The intent of the initiators is reasonably inferred from the text of the messages, drafted by Robinhood, that they sent to Plaintiffs. Both texts encouraged Plaintiffs to use the initiators' personalized link so that, if Plaintiffs created Robinhood accounts, the initiators would automatically receive the reward stock. *Id.* ¶¶ 44, 53. *See also id.* ¶ 34 (texts include unique referral links that "allows Robinhood to identify the sender of the message"). The initiators were therefore "conducting business," i.e., seeking to earn a commission, when they directed a commercial text message to fellow Washington residents.

Plaintiffs also allege that the initiators conduct business in Washington by virtue of their ongoing customer relationship with Robinhood, which they conduct from Washington. *Id.* ¶¶ 29, 48, 57. And Plaintiffs have alleged that the initiators were conducting business in the state independent of their relationship with Robinhood by virtue of their employment and other business activities in Washington. *Id.* ¶¶ 29, 48-49, 57-58. The plain meaning of "conduct business" indisputably includes these alleged activities.

Robinhood's argument is contrary to the statute's plain text. CEMA's text message prohibitions apply to "persons"—which is expressly defined to include "individuals." Wash. Rev. Code § 19.190.010(11). Other parts of CEMA, such as the prohibitions on email, do not contain any language limiting the law to businesses only and also apply to "persons." Wash. Rev. Code § 19.190.020(1). The legislature clearly contemplated that individuals, not only businesses, could be liable for $500 in statutory damages for violations of the law.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 11
Case No. 2:21-cv-01571-BJR

Finding that an individual's non-Robinhood text message related business activities in the state qualify as "conducting business" under the statute does not render the language "conducting business" surplusage. The phrase still serves its purpose in limiting the application of the law within the jurisdictional bounds of the state. Such a jurisdictional limitation is mirrored in CEMA's email prohibitions. There, the CEMA specifies that the law applies to messages sent "from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident." Wash. Rev. Code § 19.190.020(1). In regard to the CEMA's prohibitions on commercial text messages, the law applies to "person[s] conducting business in the state" that send or assist in sending commercial text messages "to a telephone number assigned to a Washington resident." Wash. Rev. Code § 19.190.060(1).

In short, the statute contains no requirement that, to be liable for assisting the transmission of an unlawful text message, the initiator be engaged in an independent violation of CEMA. Rather, the statute requires only that the initiator participate or be involved in such a violation. Plaintiffs have alleged sufficient facts to show that Robinhood assisted in the transmission of commercial text messages because it knew or consciously avoided knowing that initiators were participating in sending the texts to Washington residents without clear and affirmative consent. And, even if the statute requires initiators to conduct business in Washington, Plaintiffs have sufficiently alleged that the initiators, by virtue of sending these specific messages, by virtue of their Washington-based customer relationship with Robinhood, and by virtue of other non-Robinhood related business activities, do conduct business in Washington. Either way, *Robinhood* is accountable for the unlawful marketing scheme that it created and substantially assists in implementing—an outcome that is consistent with the legislative directive to construe the CEMA and CPA "in favor of the consumers they aim to protect." *Jametsky v. Olsen*, 317 P.3d 1003, 1006-07 (Wash. 2014); *Wright II*, 406 P.3d at 115.

**B.  Plaintiffs plausibly allege that Robinhood's texts are commercial in nature.**

The CEMA defines "commercial electronic text message" as "an electronic text message sent to promote real property, goods, or services for sale or lease." Wash. Rev. Code §

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 12
Case No. 2:21-cv-01571-BJR

19.190.010. To be "commercial" in nature, a message need not solicit money, require payment, or even mention a service for which payment is required. A text message is commercial in nature even if it offers free products or services so long as the text is designed to result in future purchases. *Gragg v. Orange Cab Co.*, 2013 WL 195466, at *4 (W.D. Wash. Jan. 17, 2013). *See also Wright I*, at *5 (referral text was "commercial" where defendant designed the text, which offered a free $25 Lyft ride, so that recipients "would use their free app to access their for-profit services."). The statute thus "regulate[s] communications that promote or encourage commercial transactions" and a "direct and immediate sale need not be in the offing to trigger the [CEMA]." *Gragg*, 2013 WL 195466, at *4 (text offering free download or link to the defendant's taxi service app was designed to result in future purchases was a commercial text under the CEMA). Plaintiffs plausibly allege that Robinhood's texts are commercial in nature. Plaintiffs allege that Robinhood offers a free mobile app that enables users to purchase stocks, exchange-traded funds, cryptocurrency, and options, and that Robinhood profits from users' transactions on the app. FAC ¶¶ 1, 25. Robinhood's text messages urge consumers to "join Robinhood." By encouraging people to "join" Robinhood, Robinhood intends for the recipients to subsequently use Robinhood's brokerage services to purchase securities and to purchase other products and services directly from Robinhood. *See Chesbro*, 705 F.3d at 915-18 (applying a "measure of common sense" to hold that automated telephone calls advising customers about changes to its rewards program were "commercial" because the point of the calls was to encourage the recipient to make future purchases at the defendant's stores).

Robinhood offers three reasons why the Court should not reach the commonsense conclusion that the refer-a-friend text messages "promoted future commercial transactions" thereby triggering CEMA. *Gragg*, 2013 WL 195466, at *4. Each reason fails. First, Robinhood asserts that because it does not charge users a commission on these commercial transactions, there is no service being sold and the texts are therefore not "commercial." But there is no requirement in the CEMA's definition of "commercial" or elsewhere that the transactions being promoted result in payments directly from the consumer to the defendant. *See* Wash. Rev. Code

19.190.010(3) ("Commercial electronic text message" means "an electronic text message sent to promote real property, goods, or services for sale or lease."). If the Court interprets the CEMA as Robinhood proposes, Robinhood would be permitted to send texts promoting their "free" for-profit services to Washington residents simply because Robinhood does not make a direct sale. This interpretation would create a categorical exemption for any business that provides a service to a consumer and profits indirectly from the transaction. That would include, for example, real estate agents, travel agents, insurance brokers, and mortgage brokers, all of whom profit indirectly by earning commissions on transactions conducted between third parties. Such a result would be counter to the intent of the legislature when enacting CEMA. *See* 2003 Wash. Legis. Serv. 137, Sec. 1. Plaintiffs' allegations that the texts promote future purchases of securities and other investments on Robinhood's App, and that Robinhood profits from those purchases, are sufficient to establish that the texts are "commercial." *See Chesbro*, 705 F.3d at 915-18.

Second, Plaintiffs' allegations regarding direct sales by Robinhood to its users, for premium accounts and account services, are independently sufficient to establish that the texts are commercial, even using Defendant's unjustifiable requirement that the transactions promoted involve a direct payment. It is of no import that the texts themselves did not mention Robinhood Gold or these other payment-based services. "Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Wright I*, 2016 WL 7971290, at *5 (quoting *Chesbro,* 705 F.3d at 918). Robinhood generates hundreds of millions of dollars in revenue each year from selling these services *directly* to users for direct payments. FAC ¶¶ 24, 26. As in *Wright*, the purpose of the texts is to encourage referred contacts to join Robinhood where they will purchase services directly from Robinhood.

Third, Plaintiffs' allegations regarding Robinhood's business model and the fact that over 80% of users join the platform through the refer-a-friend program provide factual support for the assertion that the texts are commercial—the commercial transactions the texts promote are essential to generating Robinhood's revenue. Robinhood is therefore motivated to ensure that its users continue to market the company's for-profit services.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 14
Case No. 2:21-cv-01571-BJR

|   |   |
|---|---|
| 1 | Robinhood wrongly relies on *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1132 (W.D. Wash. 2016). That case involved text messages sent promoting a free software application that transformed a user's cell phone into a walkie-talkie. *Hickey*, 887 F. Supp. 2d at 1128. Plaintiff alleged that the user paid for the software by providing personal information to the software company. The court held that the fact the plaintiff allegedly provided such "intangible" consideration did not render the transaction sufficiently "commercial" under the CEMA. *Id.* at 1132. Robinhood's customers do not pay "intangible" consideration—they pay tangible consideration when they make investments on the platform, which Robinhood profits from, and when they purchase products and services directly from Robinhood. *See Wright I*, 2016 WL 7971290, at *5 (distinguishing *Hickey* because "there was no sale of a product or services to promote," while defendant Lyft intended that referred contacts "would use their free app to access their for-profit services."); *Gragg*, 2013 WL 195466, at *4 ("The Ninth Circuit [in *Chesbro*] determined that, contrary to the holding in *Hickey*, a direct and immediate sale need not be in the offing to trigger the WADAD. The Court finds that the same analysis should apply under CEMA."). |

**C.    Alternatively, Plaintiffs should be granted leave to amend.**

If the Court dismisses any of Plaintiffs' claims, leave to amend should be granted. Leave to amend "shall be freely granted when justice so requires." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citation omitted). Allowing Plaintiffs leave to amend would not prejudice Robinhood or cause undue delay or be futile, and Plaintiffs have not acted in bad faith. *See U.S. v. Corinthian Colleges,* 655 F.3d 984, (9th Cir. 2011). Plaintiffs here would amend to address any deficiencies the Court may find.

### V.    CONCLUSION

For all these reasons, Plaintiffs respectfully request that Robinhood's motion be denied. Alternatively, Plaintiffs request that they be granted leave to amend the Complaint.

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 15
Case No. 2:21-cv-01571-BJR

RESPECTFULLY SUBMITTED AND DATED this 15th day of March, 2022.

TERRELL MARSHALL LAW GROUP

By: /s/ Beth E. Terrell, WSBA #26759
   Beth E. Terrell, WSBA #26759
   Email: bterrell@terrellmarshall.com
   Jennifer Rust Murray, WSBA #36983
   Email: jmurray@terrellmarshall.com
   936 North 34th Street, Suite 300
   Seattle, Washington 98103
   Telephone: (206) 816-6603
   Facsimile: (206) 319-5450

   E. Michelle Drake, *Admitted Pro Hac Vice*
   Email: mdrake@bm.net
   BERGER MONTAGUE PC
   1229 Tyler Street NE, Suite 205
   Minneapolis, Minnesota 55413
   Telephone: (612) 594-5999
   Facsimile: (612) 584-4470

   Sophia M. Rios, *Admitted Pro Hac Vice*
   Email: srios@bm.net
   BERGER MONTAGUE PC
   401 B Street, Suite 2000
   San Diego, CA 92101
   Telephone: (619) 489-0300
   Facsimile: (215) 875-4604

*Attorneys for Plaintiffs*

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT - 16
Case No. 2:21-cv-01571-BJR