UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| COOPER MOORE and ANDREW GILLETTE, on their own behalf and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBINHOOD FINANCIAL LLC,<br><br>Defendant. | No. 2:21-cv-01571-BJR<br><br>ORDER DENYING DEFENDANT ROBINHOOD FINANCIAL LLC'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT |

## I. **INTRODUCTION**

Plaintiffs Cooper Moore and Andrew Gillette ("Plaintiffs") brought this putative class action against Defendant Robinhood Financial LLC ("Defendant" or "Robinhood"), asserting claims under Washington's Commercial Electronic Mail Act ("CEMA"), RCW § 19.190 *et seq.*, and Washington's Consumer Protection Act ("CPA"), RCW § 19.86 *et seq.* Presently before the Court is Defendant's motion to dismiss Plaintiffs' Amended Complaint ("Motion" or "Mot.," Dkt. 55) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs oppose the Motion. Having reviewed the pleadings, the record of the case, and the relevant legal authorities, the Court DENIES the Motion. The Court's reasoning is set forth below.

ORDER - 1

## II.  FACTUAL BACKGROUND[1]

Robinhood is an online investments brokerage service firm that, through its free mobile application (the "Robinhood App") and website, offers services that enable its users to invest in stocks and other securities. AC ¶ 1.  While Robinhood does not directly charge its users commissions on trades executed through its brokerage service, it earns revenue through "Payment for Order Flow" incentive fees paid to Robinhood by principal trading firms to which Robinhood routes its users' securities orders. *Id.* ¶¶ 1, 25.  Plaintiffs allege that, in 2020, the Securities and Exchange Commission found that this trading model results in inflated trade execution prices for Robinhood users relative to the prices they would have received from Robinhood's competitors. *Id.* ¶ 25.  Robinhood also offers its users a premium subscription-based service, "Robinhood Gold," which, for a $5 monthly fee, provides subscribing users with a suite of financial tools, data, and market research, and permits them to borrow money from Robinhood in order to purchase securities on its platform. *Id.* ¶ 24.

Robinhood promotes its services in part through its "Refer a Friend" program, by which users are able to use the Robinhood App to generate and send text messages to their phone contacts inviting them to join Robinhood's platform. AC ¶¶ 2-3, 21.  To do so, a user must click "Rewards" or "Earn Rewards" in the Robinhood App homepage, which prompts the user to click "Invite Contacts" or "Share Link," which then prompts the user to select the individuals from his or her phone's contact list to which the invitation will be sent. *Id.* ¶¶ 3, 31-32.  Upon doing so, the user's phone's native text messaging application automatically opens with a pre-composed message –

---

[1] The facts recited below are taken from Plaintiffs' Amended Complaint ("AC," Dkt. 54). For the purposes of the present motion, the Court takes the factual allegations in the Amended Complaint as true.

ORDER - 2

inviting the non-user to join Robinhood, and containing a unique referral link – which the user can send as any ordinary text message. *Id.* ¶¶ 33-35.

To incentivize referrals, Robinhood compensates its users once their invited contacts join the platform and link their bank accounts to it. AC ¶ 2. Specifically, Robinhood credits both the referring user and the referred contact with either $5 or a randomly selected stock that can be worth anywhere from $2.50 and $225. *Id.* ¶¶ 2, 27. Robinhood includes a promise of free stock in the invitational text messages generated by the Robinhood App, and also displays alerts to users within the Robinhood App reminding them to "Invite Friends" to earn free stock. *Id.* ¶¶ 3, 45, 54.

On March 14, 2018, Moore received a text message from a prior contact inviting him to join Robinhood's platform. AC ¶¶ 44-45. The message contained a link to Robinhood's website and stated: "Join Robinhood and we'll both get a stock like Apple, Ford, or Sprint for free. Make sure you use my link." *Id.* On March 4, 2020, Gillette receive a similar text message from a prior contact containing a link to Robinhood's website and stating: "You now have a claim to a stock like Apple, Ford, or Facebook. In order to keep this claim to your stock, sign up and join Robinhood using my link." *Id.* ¶¶ 53-54.

On August 9, 2021, Moore filed this lawsuit as a class action "on behalf of persons who also received Robinhood's illegal spam texts." Dkt. 1. In the Amended Complaint, which adds Gillette as a plaintiff, Plaintiffs claim that Defendant, through its Refer a Friend program, violated CEMA and the CPA. Defendant moved to dismiss Plaintiffs' claims, Plaintiffs opposed the Motion ("Opp.," Dkt. 56), and Plaintiffs replied ("Rep.," Dkt. 57).

ORDER - 3

### III. LEGAL STANDARDS

#### A. Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is properly granted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "A complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016). When considering a motion to dismiss under Rule 12(b)(6), courts must accept the factual allegations in the complaint as true and construe such allegations in the light most favorable to the plaintiff. *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886-87 (9th Cir. 2018).

#### B. The Commercial Electronic Mail Act

In 2003, the Washington legislature, recognizing the "serious concerns" posed by the increase in unsolicited commercial text messages, amended CEMA to expand its scope of prohibited electronic practices to include the initiation and facilitation of commercial text messages. 2003 Wash. Legis. Serv. Ch. 137 § 1. The provisions introduced by the 2003 amendment were thus designed "to limit the practice of sending unsolicited commercial text messages to cellular telephone or pager numbers in Washington." *Id*. While those provisions do not create a private right of action, *see Wright v. Lyft, Inc.*, 189 Wash. 2d 718, 726-28 (Wn. Sup. Ct. 2017), the statute expressly provides that a violation thereof "is an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying the consumer

ORDER - 4

protection act." RCW § 19.190.060(2). Therefore, a violation of those provisions automatically constitutes a CPA violation. *Wright*, 189 Wash. 2d at 727 ("CEMA's plain language demonstrates the legislature's intent that the recipient of unsolicited text messages bring a CPA claim.").

Under CEMA, as amended in 2003, "[n]o person conducting business in the state may initiate or assist in the transmission of an electronic commercial text message to a telephone number assigned" to a Washington resident's cell phone or pager. RCW § 19.190.060(1). The statute defines "assist the transmission" to mean:

> actions taken by a person to provide substantial assistance or support which enables any person to formulate, compose, send, originate, initiate, or transmit a commercial electronic mail message or a commercial electronic text message when the person providing the assistance knows or consciously avoids knowing that the initiator of the commercial electronic mail message or the commercial electronic text message is engaged, or intends to engage, in any practice that violates the [CPA].

RCW § 19.190.010(1). The statute further defines "commercial electronic text message" to mean "an electronic text message sent to promote real property, goods, or services for sale or lease." RCW § 19.190.010(3).

## IV.   DISCUSSION

Plaintiffs claim that Robinhood, though its Refer a Friend program, violated CEMA by "assist[ing] the transmission of one or more commercial electronic text messages to Plaintiffs." AC ¶ 70. Defendant argues that the Amended Complaint fails to state a CEMA claim on several independent grounds. Specifically, Defendant contends that Plaintiffs fail to adequately allege that (1) Robinhood provided "substantial assistance or support" in enabling the referral text messages; (2) the message senders conducted business in Washington, as necessary to establish that Robinhood "kn[ew] or consciously avoid[ed] knowing" that they "engaged, or intend[ed] to engage," in a practice violating the CPA; and (3) the messages received by Plaintiffs were

ORDER - 5

"commercial text messages" as defined by the statute. *See* Mot. at 5. The Court reviews each of Defendant's arguments in turn.

### A. Whether Robinhood Provided "Substantial Assistance or Support"

Defendant contends that the Amended Complaint alleges that Robinhood had only "nominal involvement in sending the referral text messages," which is "insufficient to state a claim of 'substantial assistance' under CEMA." Mot. at 5. Defendant's contention is unavailing.

As noted above, CEMA's definition of "assist the transmission" requires the plaintiff to establish that the defendant "provide[d] substantial assistance or support which enables any person to formulate, compose, send, originate, initiate, or transmit a commercial electronic mail message or a commercial electronic text message." RCW § 19.190.010(1). Defendant urges this Court, in determining whether Plaintiffs adequately allege "substantial assistance or support," to follow case law interpreting the federal Telephone Consumer Protection Act ("TCPA") (*see* Mot. at 5-7), which makes it unlawful to "make" or "initiate" certain phone calls. 47 U.S.C. § 227(b)(1). Defendant points specifically to an inquiry courts have used in determining TCPA liability where the defendant did not physically make the call at issue. Applying the TCPA, courts have asked whether that defendant was "so involved with a communication as to be deemed to have made it." *See, e.g.*, *De la Cabada v. Ytel, Inc.*, No. 19-cv-07178, 2020 WL 1156909, at *3-5 (N.D. Cal. Mar. 10, 2020). The Court finds that this is the wrong inquiry for reviewing Plaintiffs' CEMA claim. Unlike the TPCA, CEMA makes it unlawful not only to "initiate" a commercial text message, but also to "*assist*" in the transmission of one. RCW § 19.190.060(1) (emphasis added); *see Wright v. Lyft, Inc*., No. 2:14-cv-00421, 2016 WL 7971290, *4 (W.D. Wash. Apr. 15, 2016) ("Unlike the TCPA, it makes no difference [under CEMA] if some other party 'initiated' the text message…."). As Plaintiffs do not claim that Robinhood "initiated" the messages at issue, but only "assisted" in

ORDER - 6

their transmission, the Court is not required to determine whether Robinhood can be "deemed to have made" them.

The Court, instead, looks to case law that has examined the meaning of "substantial assistance or support" when specifically reviewing CEMA claims. In *Frank v. Cannabis & Glass, LLC,* No. 2:19-cv-00250, 2019 WL 4855378 (E.D. Wash. Oct. 1, 2019), the court found that the defendant's provision of a software application to a retail store, enabling it to send text messages to its customers, was "some form of assistance," but insufficient to constitute "substantial assistance." *Id.* at *2-3. On the other hand, in *Wright*, a court in this District found that the plaintiff had pled that Lyft, a ridesharing company, violated CEMA through its application's "invite friends" feature, which prompted users to select phone contacts to which invitational messages that were pre-composed by Lyft would be sent on Lyft's behalf by an Automatic Telephone Dialing System. 2016 WL 7971290, at *1, 4. The *Wright* court found that the plaintiff had alleged "substantial assistance" because its "allegations establish[ed] a chain of events wherein [Lyft] 'assisted' with the transmission of the invitational text." *Id.* at *4.

The facts alleged in the Amended Complaint resemble *Wright* rather than *Frank*, and demonstrate Robinhood's "substantial assistance" in the invitational text messages received by Plaintiffs. Contrary to its claim of "nominal involvement," Robinhood developed and ordered the entire "chain of events" leading to the messages' formulation and transmission. *See Wright*, 2016 WL 7971290, at *4. Specifically, the Robinhood App prompts users to refer contacts with the promise of free stocks, pre-composes the messages, and then automatically generates them within the users' cell phone in such a way that enables them to be sent by the users with as few as four total clicks. *See* AC ¶¶ 3, 27, 31-35. Indeed, the messages received by Plaintiffs more closely resemble Robinhood advertisements than messages from friends. *See id.* ¶¶ 45 (Moore responding,

ORDER - 7

"Please stop sending me ads."), 54 (Gillette responding, "Is it spam?"). It is true that, unlike in *Wright*, the Robinhood users themselves ultimately send the messages, and are therefore able to edit them and dictate when they will be sent. Based on these facts, Defendant contends that it was the users, and not Robinhood, who had "full control" over the final messages' content and timing. *See* Mot. at 7. However, whether or not the Robinhood users had full control over the final messages at the point of their transmission is of no moment insofar as Plaintiffs do not seek to establish that Robinhood "initiated" the messages. Plaintiffs, here, seek to prove only that Robinhood provided "substantial assistance or support" to its users in formulating, composing, sending, originating, initiating, or transmitting them. *See* RCW § 19.190.010(1). This Court finds that the Amended Complaint adequately alleges that Defendant did so.

### B. Whether Plaintiffs Are Required to Establish that the Message Senders Were Conducting Business in Washington

Defendant argues that the Amended Complaint does not plead a CEMA violation for a second reason, to wit: that Plaintiffs "fail to allege facts demonstrating that Robinhood knew or consciously avoided knowing that the users who initiated the referral text messages were conducting business in Washington." Mot. at 8-10. Defendant misreads RCW § 19.190.010(1) and RCW § 19.190.060(1) to require Plaintiffs to allege that the text messages' "initiators" (the Robinhood users) were conducting business within the state. *Id.* As discussed below, Plaintiffs are not required to allege this in order to state a CEMA claim.

As noted above, RCW § 19.190.060(1) provides that "[n]o person conducting business in the state may initiate or assist in the transmission of an electronic commercial text message." Under RCW § 19.190.010(1), to assist in the transmission of a message – as Plaintiffs allege Robinhood did here – that person must "know[] or consciously avoid[] knowing that the initiator of the … commercial electronic text message is engaged, or intends to engage, in any practice that

ORDER - 8

violates the [CPA]." Defendant contends that this latter provision "specifies that assisters must know of the *initiator's* CPA violation," thereby requiring a plaintiff to establish that the initiator had individually violated CEMA (and consequently, the CPA). Rep. at 5 (emphasis in original). Therefore, according to Defendant, since a person must be "conducting business in the state" to violate CEMA, Plaintiffs must allege that the Robinhood users who sent the invitational messages were conducting business in Washington. *Id.*

Defendant's argument, while crafty, is based on a deliberate misconstruction of RCW § 19.190.010(1) and RCW § 19.190.060(1). As an initial matter, Defendant's proposed construction would significantly narrow the scope of CEMA's prohibition. Not only would it impose an additional "conducting business" requirement – *i.e.*, for the initiator, in addition to the assister – it would require a plaintiff to establish the initiator's independent CEMA violation even when his or her claim is brought only against the assister. That is inconsistent with the legislature's intent in enacting CEMA's 2003 amendment (*see supra* at 4) and the Washington Supreme Court's directive to "construe remedial consumer protection statutes … liberally in favor of the consumers they aim to protect." *See Jametsky v. Olsen*, 179 Wash. 2d 756, 765 (Wn. Sup. Ct. 2014).

Moreover, RCW § 19.190.010(1) does not, as Defendant contends, require that the assister know that the initiator violated the CPA, but instead requires only that the assister know that the initiator "is engaged, or intends to engage, in any practice that violates the [CPA]." RCW § 19.190.010(1). The definition of "engage," according to Black's Law Dictionary, is "[t]o employ or involve oneself; to take part in; to embark on." Engage, Black's Law Dictionary (11th ed. 2019). Therefore, consistent with that definition, RCW § 19.190.010(1) requires Plaintiffs to establish only that the assister (Robinhood) knew that the initiators (the users who sent the

ORDER - 9

invitational messages) intended to take part in a practice that would result in a CEMA violation. Plaintiffs need not establish that the initiators *individually* violated CEMA.

Accordingly, since Plaintiffs must only establish Defendant's CEMA violation, RCW § 19.190.060(1) requires them to allege only that Robinhood – and not the users who sent Plaintiffs the invitational messages – had been conducting business in Washington. As Defendant does not dispute Plaintiffs' allegation that Robinhood has been doing so (*see* AC ¶ 11), Plaintiffs have satisfied the only "conducting business" requirement pertaining to their claim.[2]

### C. Whether Plaintiffs Received "Commercial Electronic Text Messages"

Defendant's final argument is that the invitational messages received by Plaintiffs did not constitute "commercial electronic text messages" under CEMA because they did not "promote real property, goods, or services for sale or lease." Mot. at 10-14 (quoting RCW § 19.190.010(3)). According to Defendant, the messages had only offered free stock without identifying a specific service, and downloading the Robinhood App is free of charge. *See id*. Defendant's argument lacks merit.

As an initial matter, Defendant's assertion that a text message must specifically identify a good or service for sale to be "commercial" is "too narrow a reading of the statute and the intent behind the prohibition." *Wright*, 2016 WL 7971290, at *5 ("Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." (quoting *Chesbro v. Best Buy Stores, L.P*., 705 F.3d 913, 918 (9th Cir. 2012))); *see Gragg v. Orange Cab Co*., No. 12-cv-0576, 2013 WL 195466, at *4 (W.D. Wash. Jan. 17, 2013)

---

[2] Plaintiffs also argue, in the alternative, that even they are required to establish that the text message initiators had been "conducting business" in Washington, the Robinhood users who sent Plaintiffs the invitational messages are adequately alleged to have done so. *See* Opp. at 11-12. Given this Court's finding that Plaintiffs need not establish that the initiator was conducting business in Washington, it does not reach this argument.

ORDER - 10

("prohibiting unsolicited text messages that purport to offer a 'free' download or link designed to result in future purchases comports with the legislative findings and intent in enacting CEMA"). Rather, it is sufficient under CEMA that the message be designed to promote, or otherwise have the purpose of promoting, future sales of some good or service. *See Wright*, 2016 WL 7971290, at *5 (invitational message, although only advertising a free application and offering a free ride credit, was commercial because it "was clearly intending that recipients would use their free app to access their for-profit services").

While, as Defendant points out, downloading the Robinhood App is free of charge and users are not required to make use of Robinhood's offered services (*see* Mot. at 12), Plaintiffs clearly plead that the invitational messages were not designed to encourage new users simply to download the Robinhood App, collect their free stock, and then sit idly by. *See Gragg*, 2013 WL 195466, at *4 (text message promoting a taxi phone application was commercial, even though "offered at no cost," because "the only purpose of the offer was to promote or encourage the use of defendants' taxi services"). Rather, the Amended Complaint adequately alleges that the text messages received by Plaintiffs served the purpose of promoting for-profit services offered by Robinhood: Robinhood Gold and Robinhood's brokerage service. *See* AC ¶¶ 24-26.

Moreover, Plaintiffs plead that these services were "for sale." *See* RCW § 19.190.010(3). Defendant compares the Robinhood App to the free phone application at issue in *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125 (W.D. Wash. 2012). There, a court found that the plaintiff failed to plead that a text message inviting him to download the application was "commercial" because he pointed only to "intangible consideration" necessary to use its service: "personal information, telephone data charges," and an "agreement to pay to use [the application] if it begins to charge users in the future." *Id.* at 1132-33. Here, the Amended Complaint alleges specific

ORDER - 11

charges for Robinhood's services that are not "intangible."  Specifically, Robinhood offers Robinhood Gold to users on a $5 per month subscription basis, and also charges users interest on loans extended to them through that service.  *See* AC ¶ 24.  With respect to Robinhood's brokerage service, while it may be "commission-free" as Defendant points out (*see* Mot. at 11-13), that service entails numerous avenues through which Robinhood users part with their money.  First, Robinhood directly charges its users certain miscellaneous fees in connection with the service: $75 fees for transferring accounts to other broker-dealers, $20 fees for delivering checks, and $5 fees for providing paper account statements.  *See* AC ¶ 26.  Second, Plaintiffs have plausibly alleged that the service's trading model – whereby Robinhood receives incentive fees from the principal trading firms to which orders are sent – results in inflated trade execution prices for Robinhood users relative to the prices they would have received from Robinhood's competitors.  *See id.* ¶ 25.  Thus, Plaintiffs claim that users pay indirectly to use Robinhood's brokerage service.  Plaintiffs' allegations demonstrate that Robinhood charges its users both directly and indirectly in connection with Robinhood Gold and its brokerage service, such that they constitute services "for sale."

Accordingly, Plaintiffs have adequately alleged that the invitational messages they received were "commercial electronic text messages."

### V. CONCLUSION

For the foregoing reasons, the Court rejects Defendant's challenges to the adequacy of the Amended Complaint.  Therefore, Defendant Robinhood's motion to dismiss (Dkt. 55) is DENIED.

SO ORDERED.

Dated:  August 3, 2022

_____
Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER - 12